Eugene G. Iredale, SBN: 75292
Julia Yoo, SBN: 231163
IREDALE & YOO, APC
105 West "F" Street, Fourt Floor
San Diego, California 92101-6036
Telephone: 619.233.1525
Facsimile: 619.233.3221

Attorneys for Plaintiff
Juan Carlos Vera

**UNITED STATES DISTRICT COURT**
**THE SOUTHERN DISTRICT OF CALIFORNIA**
(Hon. M. James Lorenz)

| | |
|---|---|
| JUAN CARLOS VERA, an individual, | Case No. 10-cv-01422-L-JMA |
| Plaintiff, | PLAINTIFF'S OPPOSITION TO DEFENDANT HANNAH GILES' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| JAMES O'KEEFE III, an individual, HANNAH GILES, an individual, and DOES 1-20 inclusive, | Date: June 11, 2012<br>Time: 10:30 a.m.<br>Ctrm: 14 |
| Defendants. | |

## **TABLE OF CONTENTS**

I.   FACTS ...................................................................................................................1

II.  LEGAL STANDARD ...........................................................................................5

III. ARGUMENT .........................................................................................................6

    A.  The Parties Engaged in Confidential Conversations at Defendant's Own Request ................................................................................................................6

    B.  Even If Third Parties Overheard the Parties' Conversation, Mr. Vera Still Had a Reasonable Expectation of Privacy ..................................................10

    C.  Juan Carlos Vera is Entitled to Damages ...................................................11

IV.  CONCLUSION ...................................................................................................14

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................................6, 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...............................................................................6

*Coulter v. Bank of America*, 28 Cal. App. 4th 923 (1994) ..........................................................8, 10

*Fairfield v. American Photocopy etc. Co.* (1955) 138 Cal. App. 2d 82..........................................13

*Flanagan v. Flanagan*, 27 Cal. 4th 766 (2002) ...............................................................................8

*Friddle v. Epstein* (1993) 16 Cal.App.4th 1649 ...........................................................................15

*Frio v. Superior Court*, 203 Cal. App. 3d 1480 (1988) ..................................................................8

*Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107 (9th Cir. 2003) .................................................6

*Huskey v. National Broadcasting Co., Inc.* (N.D.Ill. 1986) 632 F.Supp. 1282. .........................11

*Lieberman v. KCOP TV, Inc.*, (2003) 110 Cal. App. 4th 156 ...............................................9, 12, 14

*Liston v. County of Riverside*, 120 F.3d 965 (9th Cir. 1997) ........................................................16

*Marich v. MGM/UA Telcommunications*, 113 Cal. App. 4th 415 (Cal. App. 2d Dist., Dec. 16, 2003) ...................................................................................................................................12, 13

*Marrs v. Marriott Corp.* (D.Md. 1992) 830 F. Supp. 274 .............................................................11

*McDaniel v. Atlanta Coca-Cola Bottling Co.* (1939) 60 Ga.App. 92 ...........................................11

*McNairy v. C.K. Realty*, 150 Cal. App. 4th 1500 (Cal. App. 2d Dist. 2007) ..........................14, 15

*Miller, v. National Broadcasting Co.*, (1986) 187 Cal. App. 3d 1463..............................12, 13, 14

*O'Laskey v. Sortino*, 224 Cal. App. 3d 241 (1990) ........................................................................8

*Prinzi v. Keydril Co.*, (5th Cir. 1984) 738 F.2d 707 ......................................................................15

*Rafferty v. Hartford Courant Co.* (1980) 36 Conn.Supp. 239 .......................................................11

*Ribas v. Clark*, 38 Cal. 3d 355  (1985) ...........................................................................................8

*Sanders v. American Broadcasting Companies, Inc.*, 978 P.2d 67 (Cal. 1999) ......................10, 11

*Santos v. Gates*, 287 F.3d 846 (9th Cir. 2002) ..............................................................................16

*Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 809.........................................10

*Shulman v. Group W Productions Inc.*, 955 P.2d 469 (1988) ...................................................8, 10

Stessman v. Am. BlackHawk Broadcasting (Iowa 1987) 416 N.W.2d 685, 687 ........................11

*Turnbull v. ABC*, 2004 U.S. Dist. LEXIS 24351 (D. Cal. 2004) ...................................................10

*United States v. McIntyre* (9th Cir. 1978) 582 F.2d 1221 ............................................................11

*Wilkings v. National Broadcasting Co., Inc.*, 71 Cal. App. 4th 1066 (1999) ..................................8

**STATUTES**

Cal. Penal Code § 632 ..............................................................................................................8, 10

Cal. Civ. Code § 3333 ....................................................................................................................11

Cal. Penal Code § 637.2 ................................................................................................................15

**RULES**

Fed. R. Civ. P. 56(c)(2) ...................................................................................................................5

COMES NOW Plaintiff, JUAN CARLOS VERA, by and through his attorneys of record, Eugene G. Iredale and Julia Yoo, and submits this Opposition to Defendants' Motion for Summary Judgment and states the following:

**I.
FACTS**

On August 18, 2009, Defendants O'Keefe and Giles visited the ACORN office in National City, California, wearing a hidden camera. (Vera Decl ¶3)  There were two other people in the ACORN office that day, a man who left shortly after O'Keefe and Giles arrived and David Lagstein. (Vera Deposition, 83:7-13)  No other person was present. (Vera Decl at ¶5)  A conversation inside Mr. Vera's office conducted in a normal tone of voice cannot be overheard from outside his office. (Vera deposition, 72:7-21; Lagstein deposition 113:16-21) The physical layout of the ACORN office was such that people outside of a private office couldn't hear any of the conversation taking place inside. (Lagstein deposition, 114:8-20)  Defendants asked Mr. Vera whether the conversation would be kept confidential and Mr. Vera agreed. (Vera Decl at ¶4)   There was no one in the ACORN office who could overhear their conversations. (*Id* at ¶5)  When Defendants began discussing underage prostitution, Mr. Vera continued to engage them in conversation so that he could report them to his cousin who was a detective with the National City Police Department. (*Id* at ¶8)  After Defendants left the office, Mr. Vera contacted his cousin and reported the incident. (*Id* at ¶9)  Mr. Vera's cousin then forwarded the report to San Diego Police Department. (*Id* at ¶10)

While Mr. Vera was assisting the police investigation of underage prostitution, Defendants released an edited videotape of their confidential conversation with Mr. Vera on the Internet.  The content and the nature of the presentation of the edited videotape suggested that Mr. Vera was complicit in promoting underage prostitution. (*Id* at ¶12)   It was the intention of the Defendants from the beginning to distribute these secret recordings. (O'Keefe deposition, 61:14-20)  O'Keefe had discussed publication of the videos with Andrew Breitbart.  The first such communication took place on July 31, 2009. (*Id* at 73:2-10)   On August 6, 2009, O'Keefe met with Breitbart in person, who agreed to help market these videos to various media outlets.

2

1  (*Id* at 75:15-24)   In mid-August, O'Keefe and Breitbart discussed compensation.  (*Id* at 76:12-
2  22)   O'Keefe was ultimately paid a total of $65,000 by Breitbart.  (*Id* at 84:22-85:8)   Giles was
3  promised a contract at $60,000 per year.  (Giles deposition, 59:23-25)

4  When Defendants visited ACORN, O'Keefe was wearing a blue dress shirt, khaki pants,
5  brown Docksider shoes, and a tie.  (O'Keefe deposition, 170:2 - 171:10)   O'Keefe wore a tie
6  that concealed the video camera which recorded the conversations.   (Giles deposition, 51:4-21)
7  They also recorded the audio of the conversations with O'Keefe's cell phone.   (Giles deposition,
8  52:2-12)   In the video Defendants manufactured and released to the world, O'Keefe is seen in
9  his grandmother's chinchilla coat, (O'Keefe deposition, 108:3-5) a pimp hat purchased by his
10 grandfather in Las Vegas (*Id* at 110:5-13), and a cane from the Dollar Store.  (*Id* at :14-23)
11 Defendants made public the edited version of the videotape but not the original unedited version,
12 which was never made public on the websites they used.  (O'Keefe deposition, 235:4-13)   The
13 edited version is accompanied by the song "Ridiculous" performed by Anthony Dini, (who has
14 been called "an ersatz Vanilla Ice"), at the beginning and end of the video as O'Keefe is seen
15 parading around in his grandmother's chinchilla coat.  The video of Mr. Vera aired for days on
16 the Fox news channel followed by widespread viewing on Youtube, which garnered significant
17 public attention.   (Vera Decl at ¶12)  Mr. Vera was publicly humiliated and ashamed as a result
18 of the videotaping.   (Vera Decl at ¶12 )

19 O'Keefe testified that Defendants videotaped people without obtaining their permission.
20 (O'Keefe deposition, 39:9-21) O'Keefe was aware from an earlier incident of secretly taping
21 employees of Planned Parenthood that California had a law that made it illegal to tape record
22 people in certain circumstances.  (*Id* at 41:7-11) O'Keefe was aware from the earlier case that
23 there was a California law against secretly recording people without their consent.  (*Id* at 41:12-
24 18) O'Keefe did not look up the law and did not seek counsel from an attorney but decided that
25 he hadn't violated the law.  (*Id.* at 47:2-5) [1]

26
27 [1] In May of 2010, Defendant O'Keefe pled guilty to violation of Title 18, United States
28 Code, Sections 1036(a)(1) and 2, entry by false pretenses onto real property of the United States.
This involved another case in which O'Keefe and his codefendants went into the office and the

1    In support of her Motion for Summary Judgment, Defendant Giles has submitted a
2 videotape of the illegal recording and the transcript of their conversations.  The videotape[2]
3 submitted by Giles of the interaction with Mr. Vera shows the following: The video begins at
4 20:09:20.  It shows O'Keefe and Giles walking on a sidewalk. They enter a building. (20:10:06)
5 No one else is in the building. (*Id.*)  They walk up stairs which are entirely empty. (20:10:10)
6 They go down a corridor and open an office door. (20:10:37)  At 20:10:46 they enter into the
7 office. The office space contains a large common area with a conference table. (*Id.*)  One of the
8 two knocks on the door after entering. (*Id.*)  O'Keefe's camera focuses on a private office to the
9 left of the entry. (20:11:15)  A person is seen standing just inside the office door. (*Id.*)  That
10 person, a male client, then leaves the private office at approximately 20:11:39.  He leaves the
11 ACORN offices. (*Id*.)  O'Keefe and Giles approach the private office. (20:11:44)  Juan Carlos
12 Vera is at the back of the private office behind a partition (*Id.*)  He rises and comes forward to
13 speak to the two. (20:11:51)  O'Keefe asks if he can talk "for a minute or two." (20:12:06)   Mr.
14 Vera asks if he can give them an appointment to speak to him at a later time. (20:12:28)  Mr.
15 Vera goes back into the private office behind a partition. (20:12:30)  He is hidden from view (*Id.*)
16 At 20:12:36 Giles and O'Keefe step outside Mr. Vera's office.  During an extended break,
17 O'Keefe speaks to Giles just outside the private office door of Mr. Vera's office. (20:13:12)
18 O'Keefe says to Giles at approximately 20:13:17: "I think we should ask him about the issue
19 with the girls because it's sort of like a timely thing. I don't know if they can help us."  To this
20 Giles replies: "I know" (Transcript p.4)   O'Keefe then moves so as to videotape the entire

---

telephone system of United States Senator Mary Landrieu located in the Hale Boggs Federal Building in New Orleans, Louisiana.  Defendant O'Keefe is currently on probation from that offense.  (O'Keefe deposition, 188:10-22)

[2]The videotape is erroneously dated 2005.08.15. The testimony was undisputed that the recording occurred on August 18, 2009. The time displayed on the screen is in error. The videotape begins at 20:09:20. The deposition testimony reflects that the video was approximately 1 hour long, and that the taping concluded at approximately 6:00 p.m. or 1800 hours.

4

1  common area outside the private office of Mr. Vera. (20:13:40)³  The video shows that no one
2  else is present. (*Id.*)  At approximately 20:13:55, O'Keefe and Giles enter into the private office
3  of Mr. Vera and begin to speak to him at or inside the area described by the partition.  At
4  20:15:11 Mr. Vera asks "Could you give me five minutes and I can assist you?" O'Keefe and
5  Giles step outside the private office and the video shows again that no one else is present in the
6  large common room area. (20:15:21)

7  At approximately 20:17:18, O'Keefe and Giles enter Mr. Vera's private office.  They
8  begin to talk to him. At 20:17:45 O'Keefe asks Mr. Vera: "Wait, before you... before you begin
9  I'm... Can you... this is confidential, right?"  Mr. Vera replies, "Yeah."  O'Keefe then says
10 "Thank you." Giles then asks "So it's not being recorded or anything?" Mr. Vera replies "No."
11 (Transcript pp. 6-7)  Giles and O'Keefe speak to Mr. Vera for an extended period.  At
12 approximately 20:36:35 David Lagstein (Mr. Vera's supervisor) knocks on Mr. Vera's private
13 office door.  Mr. Lagstein says, "Excuse me ," and then enters Mr. Vera's office. (*Id.*)  After the
14 knock on the door Giles and O'Keefe are silent. (*Id.*)  Mr. Lagstein speaks to Mr. Vera about a
15 memo (20:36:34). Mr. Lagstein then says "you can ask me about it later, I'm sorry" (20:36:35)
16 and leaves the office.  The parties are thereafter silent for at least 15 seconds after Mr. Lagstein's
17 departure.  At 20:47:50 O'Keefe leaves the private office.  A video is made of the entire larger
18 central area outside the private office of Juan Carlos. (20:48:04)  No one is present. (*Id.*)  Giles
19 and O'Keefe then return to the office area to ask for Mr. Vera's cell phone number. (20:48:17)
20 At 20:50:10 Giles and O'Keefe leave the ACORN offices.  They walk down an empty hallway,
21 descend an empty staircase and walk out of the building onto the sidewalk. (*Id.*)  They walk to
22 their parked car. After Giles enters the car she says to O'Keefe, "I left my sunglasses in the
23 office." (20:51:59)  They return to the building.  They see Mr. Vera on the sidewalk.  They enter
24 the building which is empty . (20:54:45)  Mr. Vera walks up the stairwell as Giles waits with
25 O'Keefe at the foot of the stairs. (20:54:55)   At 20:56:01 Mr. Vera returns and hands Giles her

26

27  ³O'Keefe had a small camera the size of a pin embedded in a tie he wore.  This camera
28  recorded both video and audio.  He had a second separate device which recorded audio only.
    (O'Keefe deposition, 88-90)

5

1   sunglasses.  He then speaks with her and O'Keefe. (20:56:05)  They converse with no one else
2   present until 21:04:00.  O'Keefe and Giles then leave the building and return to the parked car.
3         The video shows six separate recorded conversations: one from 20:11:46 to 20:12:32
4   followed by the exit of O'Keefe and Vera from the private office. A second recorded
5   conversation begins at 20:13:42 after their return to Mr. Vera's private office and continues until
6   20:15:18 when O'Keefe and Giles leave the private office for a second time. A third separate
7   conversation with Mr. Vera is recorded after the pair return to his office at 20:17:20. The third
8   conversation between Giles, O'Keefe and Mr. Vera ceases just before Mr. Lagstein knocks and
9   enters at 20:36:36 and has a conversation with Mr. Vera alone until 20:36:56. A fourth
10  conversation begins more than fifteen seconds after Mr. Lagstein's departure. The fourth
11  recorded conversation ends when O'Keefe and Giles leave the office.
12        At 20:54:01, while O'Keefe and Vera return to the building for her sunglasses, they
13  record Mr. Vera speaking to a third party on his cell phone.  He then tells them he will get the
14  sunglasses. This fifth conversation terminates when Mr. Vera walks up the stairs alone at
15  20:54:50. The sixth discrete recorded conversation occurs in the stairwell, with only the parties
16  present. It lasts from 20:56:00 until 21:04:59. O'Keefe and Giles then leave the building.
17  Each of the six separate conversations were recorded by a video camera which also captured
18  sound, and a separate audio recording device. O'Keefe arranged for the Internet posting of both
19  audio alone, and edited video recordings. There were thus 12 separate violations of Penal Code §
20  632: six separate and discrete conversations recorded by both audio and video.

## II.
## LEGAL STANDARD

23        Summary judgment is proper where the pleadings and materials demonstrate "there is no
24  genuine issue as to any material fact . . . the movant is entitled to judgment as a matter of
25  law." FED. R. CIV. P. 56(c)(2); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A material
26  issue of fact is a question a trier of fact must answer to determine the rights of the parties under
27  the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A
28  dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the

1  non-moving party." *Id.*

2  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate
3  inferences from the facts are jury functions, not those of a judge." *Id* at 255.  The moving party
4  bears "the initial responsibility of informing the district court of the basis for its motion."
5  *Celotex*, 477 U.S. at 323.  To satisfy this burden, the movant must demonstrate that no genuine
6  issue of material fact exists for trial. *Id* at 322.  The court must review the record as a whole and
7  draw all reasonable inferences in favor of the non-moving party. *Hernandez v. Spacelabs Med.*
8  *Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

9  The facts in light most favorable to Juan Carlos Vera shows that he had a confidential
10 conversation, one in which he had a reasonable expectation of privacy, that was illegally
11 recorded by the Defendants.  It is undisputed that the parties agreed at the Defendants' request to
12 keep the conversations private and confidential.   It is also undisputed that Mr. Vera suffered
13 severe emotional harm from the acts of the defendants in portraying him as someone who
14 engages in underage prostitution.  Summary judgment should be denied

### III.
### ARGUMENT

#### A. THE PARTIES ENGAGED IN CONFIDENTIAL CONVERSATIONS AT DEFENDANTS' OWN REQUEST

Defendant Giles testified to the following during her deposition:

> Q  At some point O'Keefe says wait.  Before you begin um can you -- this is confidential, right?  And Juan Carlos said yeah. Am I correct?
>
> A  Yes.
>
> Q  And James says thank you.  Right?
>
> A  Yes.
>
> Q  Then you say it's like it's not being recorded or anything.
>
> A  Correct.
>
> Q  And Juan Carlos said no no no.  Right?

7

1  A   Yes.

2  Q   But of course it was being recorded.

3  A   Yes.

4  Q   You just didn't bother to tell him that.

5  A   Right.

6  Q   You didn't want to tell him that.

7  A   No.

8  Q   You wanted to act like you were afraid it might be recorded so that he would think for sure it wasn't being recorded. Yes?

9  A   Yes.  (Giles deposition, 117:13-118:8)

Defendants specifically asked Juan Carlos Vera to keep their conversation "confidential." Mr. Vera agreed.  The undisputed facts of the case are that the parties' conversations took place inside Mr. Vera's private office and subsequently in the stairwell with no other person present. A conversation inside Mr. Vera's office cannot be heard from outside the office.  In the ACORN office that day, there were two other people, a male client who left shortly after Defendants arrived and Mr. David Lagstein, another employee of ACORN.   When Mr. Lagstein came to Mr. Vera's office momentarily, the parties stopped their conversation.  They resumed their conversation only when Mr. Lagstein left Mr. Vera's office.

The leading cases on this issue are *Flanagan v. Flanagan*, 27 Cal. 4th 766 (2002), *Frio v. Superior Court*, 203 Cal. App. 3d 1480,(1988); *and Coulter v. Bank of America*, 28 Cal. App. 4th 923, 929 (1994). *See e.g. Shulman v. Group W Productions Inc.*, 18 Cal. 4th 200, 234-35, 955 P.2d 469 (1998); *see also Wilkins v. National Broadcasting Co., Inc.*, 71 Cal. App. 4th 1066, 1080 (1999).   The test used to determine the confidentiality of any given communication is an objective one. *Coulter, supra*, 28 Cal. App. 4th at 929. "A conversation is confidential if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." *Flanagan, supra*, 27 Cal. 4th 766, 768 (2002)(citing *Frio, supra*, 203

1  Cal. App. 3d 1480; *Coulter v. Bank of America*, 28 Cal. App. 4th 923 (1994); *and over-ruling*
2  *O'Laskey v. Sortino*, 224 Cal. App. 3d 241, 248 (1990)).

3      "Under section 632 confidentiality appears to require nothing more than the existence of a
4  reasonable expectation by one of the parties that no one is listening in or overhearing the
5  conversation." *Frio, supra*, 203 Cal. App. 3d at 1490. "While one who imparts private
6  information risks the betrayal of his confidence by the other party, a substantial distinction has
7  been recognized between the secondhand repetition of the contents of a conversation and its
8  simultaneous dissemination to an unannounced second auditor, whether that auditor be a person
9  or a mechanical device." *Coulter*, 28 Cal. App. 4th at 929 (*quoting Ribas v. Clark*, 38 Cal. 3d
10 355, 360-361 (1985).) "The Privacy Act has long been held to prevent one party to a
11 conversation from recording it without the other's consent." *Ribas, supra*, 38 Cal. 3d at 360.

12     Defendant Giles seems to advance a theory that a conversation is only confidential if it
13 takes place inside a locked building in a secret location with no public access.  By this definition,
14 almost no one in an office is entitled to protection under Penal Code § 632.  It is undisputed that
15 Defendants asked Mr. Vera for a confidential conversation.  Mr. Vera had an expectation of a
16 private conversation due to the specific request of the Defendants and the parties' agreement to
17 keep it confidential.  By Defendants' own admission, they requested a confidential conversation
18 (O'Keefe deposition, 56:2-11) and there was no one else in the office at the time listening to
19 them.  When another person, David Lagstein, came to Mr. Vera's office, they stopped the
20 conversation.  Parties began another conversation only when Mr. Lagstein left Mr. Vera's office
21 and was out of earshot.

22     There is no dispute that the parties did not carry on a conversation in front of others.
23 Giles testified that there were two other people in the large ACORN office on the day she
24 secretly recorded Mr. Vera.  (Giles deposition, 109:17-20).  The "large man" as Giles described
25 never participated in any conversation with Mr. Vera and was never within 20 feet of the
26 conversation defendants had with Mr. Vera.  (*Id.* at 108:1-13).  The "thin man" as Giles

27
28

9

1   described came to Mr. Vera's office door, "said a few words to Juan Carlos and left." [4] (*Id*. at

2   106:3-5). Giles testified that this "thin man" came back at a later time, "looked in to check to see

3   if they were still there" then went away. (*Id*. at 106:6-13). Defendant Giles testified that the

4   conversation on the stairwell took place with no one else present. (*Id*. at 124:15-24).

5         Despite Giles' wild speculation as to who may have been hiding behind the water cooler,

6   or the fax machine,[5] eavesdropping on their conversation, the testimony in this case is that the

7   physical layout of the ACORN office was such that people outside of an office wouldn't be able

8   to hear any of the conversation taking place inside. (Lagstein deposition, 114:8-20).   Defendant

9   Giles relies heavily on *Lieberman v. KCOP TV, Inc*., (2003) 110 Cal. App. 4th 156, a case

10  involving a secret recording of a doctor during consultation in which a third party was present in

11  the examination room. In *Lieberman*, the trial found "that the recorded transaction was a

12  'confidential communication' within the context of *section 632*, despite the presence of the third-

13  party companions." *Id* at 163.  The *Lieberman* court found:

> "The concept of privacy is relative. ( *Sanders, supra, 20 Cal.4th at p. 916*.) Whether a person's expectation of privacy is reasonable may depend on the identity of the person who has been able to observe or hear the subject interaction. ( *Id. at p. 923*; *Shulman, supra, 18 Cal.4th at pp. 233-235*.) The presence of others does not necessarily make an expectation of privacy objectively unreasonable, but presents a question of fact for the jury to resolve. (Cf. *Shulman, supra, 18 Cal.4th at pp. 233-235* [as element of California intrusion tort].)
>
> Lieberman's evidence demonstrates that he expected his communications to be private and did not expect them to be recorded.  We conclude that he has satisfied his burden under *section 425.16* to present a prima facie case. But we do not resolve issues of credibility in connection with a SLAPP motion. ( *Seelig v. Infinity Broadcasting Corp. (2002) 97 Cal.App.4th 798, 809 [119 Cal. Rptr. 2d 108]*.) It is for the jury to decide whether under the circumstance presented Lieberman could have *reasonably* expected

---

[4]The "thin man" was David Lagstein, Mr. Vera's supervisor who had his own private office in the suite.

[5]There is undisputed testimony that there were no heavy set Mexicans, midgets or leprechauns who would creep around the ACORN office in order to disturb confidential or privileged communication, so that they would put their ears to the wall in order to  prevent people from speaking in a confidential or private way. (Lagstein deposition, 37:15-23)

> that the communications were private. (See *Sanders, supra,* 20 Cal.4th at p. 926; see also *Coulter v. Bank of America* (1994) 28 Cal.App.4th 923, 929 [33 Cal. Rptr. 2d 766].)" *Id* at 169.

A similar argument was made by defendant ABC in a motion for summary judgment in the Central District of California in *Turnbull v. ABC*, 2004 U.S. Dist. LEXIS 24351 (D. Cal. 2004). In *Turnbull*, Defendants argued that the recorded conversations were not confidential because they could be overheard by others, including the reporter who secretly recorded the conversation. "If the court were to accept Defendants' argument, it would vitiate the statute. *See* Cal. Penal Code § 632. Defendants are arguing, in effect, that anything that can be overheard is not confidential. However, in order for a conversation to be recorded, it must be overheard -- in this case by a sensitive recording device." *Turnbull*, 2004 U.S. Dist. LEXIS 24351, at *26.

There is no dispute that all three parties to the conversations agreed at the request of O'Keefe and Giles that the conversations would be kept confidential. It is in bad faith for Defendants to assert that Mr. Vera did not have a reasonable expectation of privacy after they entered into a specific agreement.

### B. EVEN IF THIRD PARTIES OVERHEARD THE PARTIES' CONVERSATION, MR. VERA STILL HAD A REASONABLE EXPECTATION OF PRIVACY.

Even if *arguendo* there had been other ACORN employees in the office that day who could overhear the parties' conversation, *Sanders v. American Broadcasting Companies, Inc.*, 978 P.2d 67 (Cal. 1999) "held that plaintiff had a limited right of privacy against being covertly videotaped by a journalist in his workplace, even though his interaction with that journalist may have been witnessed, and his conversations overheard, by coworkers" *Id*. "We hold only that the possibility of being overheard by coworkers does not, as a matter of law, render unreasonable an employee's expectation that his or her interactions within a nonpublic workplace will not be videotaped in secret by a journalist." *Id* at 77.

According to *Sanders*, the fact that third parties may be able to see or hear the parties does not vitiate a person's reasonable expectation of privacy. *See Huskey v. National Broadcasting Co., Inc. (N.D.Ill. 1986) 632 F.Supp. 1282*. (Inmate had expectation of privacy from NBC's camera operator even though he could be seen by guards, prison personnel and

11

1  inmates); *McDaniel v. Atlanta Coca-Cola Bottling Co.* (1939) 60 Ga.App. 92 (electronic
2  eavesdropping on hospital room conversations is intrusion); *Stessman v. Am. BlackHawk*
3  *Broadcasting* (Iowa 1987) 416 N.W.2d 685, 687 (filming in private dining room of restaurant
4  might be intrusion on patron's privacy, despite lack of complete seclusion); *Rafferty v. Hartford*
5  *Courant Co.* (1980) 36 Conn.Supp. 239 (newspaper's photographing and reporting events at
6  private party, contrary to prior agreement, could form basis for an intrusion action, even though
7  party was held outdoors rather than in private home).

8      The California Supreme Court held that an employee may have a reasonable expectation
9  of privacy against electronic intrusion by a stranger to the workplace, despite the possibility that
10  the conversations and interactions at issue could be witnessed by coworkers or the employer. *See*
11  *Sanders* at 74. The *Sanders* Court distinguished cases like *Marrs v. Marriott Corp. (D.Md.*
12  *1992) 830 F. Supp. 274*, which found that an employee had a reasonable expectation of privacy
13  in an open office. "The court's holding that one employee did not have a reasonable expectation
14  of privacy against the *employer's* filming of events at another employee's desk says nothing about
15  whether an employee's personal interactions in the workplace may reasonably be considered
16  private as against covert filming by an agent for an entity other than the employer, as, in this
17  case, a television network." *Id* at 75 (emphasis in the original).

18      In *United States v. McIntyre* (9th Cir. 1978) 582 F.2d 1221, a city's chief of police and a
19  lieutenant in the department directed two police officers to "bug" the assistant chief's office. The
20  officers placed a briefcase containing a microphone in the assistant chief's office, by which
21  means they monitored a conversation in the office. Convicted of criminally violating the anti-
22  wiretapping law (*18 U.S.C. § 2510(2), 2511*), the chief and lieutenant contended on appeal that
23  any expectation of privacy on the assistant chief's part was unreasonable, because his office door
24  was open and a records clerk worked 15 feet away in an adjacent room. The Ninth Circuit
25  rejected that argument: "A business office need not be sealed to offer its occupant a reasonable
26  degree of privacy." *Id* at 1224.
27  ///
28  ///

### C.  JUAN CARLOS VERA IS ENTITLED TO DAMAGES FOR BOTH THE ILLEGAL RECORDINGS AND THEIR BROADCAST

Defendants cite no case allowing them to seek the ruling of the Court via summary judgment on the issue of damages only, assuming the loss of their summary judgment motion on the §637.2 cause of action.  Rule 56 should not be used in this fashion.  The precise measure of damages should be reserved for trial.  Summary judgment is not appropriate factually or procedurally on the scope of damages.

In addition, Defendants are legally wrong in their analysis of damages.  *Lieberman v. KCOP TV, Inc.*, *Supra*, is a case involving "anti-SLAPP" statute.  There is no anti-SLAPP motion in this case.  Defendants misrepresent the holding of *Lieberman* in claiming that they are exempt from damages resulting from the broadcast of their illegal recordings of Mr. Vera, even though they recorded for the purpose of later broadcasting and received money for their criminal act of violating P.C. §632.  *Marich v. MGM/UA Telcommunications*, 113 Cal. App. 4th 415 *(Cal. App. 2d Dist., Dec. 16, 2003)* specifically addressed the issue of damages.  The *Marich* court clearly held that *"Lieberman* **does not stand for the proposition that damages may not be recovered for a subsequent publication of an unlawfully obtained recording. The law is to the contrary**.  As a general proposition, a plaintiff may recover for his or her personal injuries, such as emotional distress, caused by seeing a broadcast of an illegal recording. (*See Lieberman v. KCOP Television, Inc., supra*, 110 Cal.App.4th at p. 167 [under *Pen. Code, § 632*]; *Miller, v. National Broadcasting Co.* (1986) 187 Cal. App. 3d 1463, 1480-1481, 1485 [film obtained by trespass].)"  *Marich* at 432-433 (emphasis added).

"Under California law, the 'consequences' flowing from an intentional tort such as a trespass may include emotional distress either accompanied by a physical injury to the person or to the land. The basic statutory provision concerning tort damages reflects this view, in providing that '[f]or the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not.' (Civ. Code, § 3333.)" *Miller* at 1481.

*Miller, v. National Broadcasting Co. supra*, involved a claim for trespass when a camera crew intruded into a bedroom to film the Plaintiff's husband being attended to after a heart attack. Miller court found that "'consequences' would include plaintiff wife's anguish, i.e., her emotional distress when NBC broadcast her husband's dying moments." *Id.* *Miller* discussed the claim for damages that stem from an unlawful intrusion:

> "Damages recoverable in California for invasion of a privacy right were discussed in detail in *Fairfield v. American Photocopy etc. Co.* (1955) 138 Cal. App. 2d 82 [291 P.2d 194]. The Court of Appeal declared that because the interest involved privacy, the damages flowing from its invasion logically would include an award for mental suffering and anguish. *Fairfield* was an appropriation case, but the principles it laid down concerning damage awards in privacy cases relied on a body of California law which had already recognized violation of the right of privacy as a tort.
>
> The court also referred to opinions of other jurisdictions, however. "The gravamen of the action here charged is the injury to the feelings of the plaintiff, the mental anguish and distress caused by the publication. In an action of this character, special damages need not be charged or proven, and if the proof discloses a wrongful invasion of the right of privacy, substantial damages for mental anguish alone may be recovered. (*Id*, at p. 89.)
>
> *Fairfield* also approved the rule that 'One whose right of privacy is unlawfully invaded is entitled to recover substantial damages, although the only damages suffered by him resulted from mental anguish.' (*Id*, at p. 89.)
>
> The elements of emotional distress damages, i.e., anxiety, embarrassment, humiliation, shame, depression, feelings of powerlessness, anguish, etc., would thus be subjects of legitimate inquiry by a jury in the action before us, taking into account all of the consequences and events which flowed from the actionable wrong." *Miller* at 1484-1485.

Defendants may not escape liability by asserting that Andrew Breitbart is the one who published the video. It was their intention from the beginning to distribute these secret recordings. O'Keefe had discussed publication of the videos with Andrew Breitbart, the first communication taking place on July 31, 2009, weeks before O'Keefe and Giles secretly recorded Mr. Vera. On August 6, 2009, twelve days before the secret recording took place, O'Keefe met with Breitbart in person, who agreed to help market these videos to various media outlets. In

14

mid-August, O'Keefe and Breitbart discussed compensation. O'Keefe and Giles were each promised $65,000 and $60,000, respectively, by Breitbart after Mr. Vera's video aired.

O'Keefe edited the video for maximum publicity and exposure. Giles traveled to New York on a media blitz and became a celebrity, propelling her career, in order to promote the video that was airing nationwide. In the process, Defendants left Juan Carlos Vera in the wake, his reputation destroyed, his employment lost, and his peace of mind destroyed. This was a foreseeable result of the specific plan Defendants had to secretly tape their victims, edit the videos for maximum exposure and market them. The whole purpose of the taping was to make it public.

An actionable violation of section 632 occurs the moment the surreptitious recording or eavesdropping takes place, regardless whether it is later disclosed. Liability is established at the time of the recording, not at the time of the publication. However, this does not mean that damages are cut off at the moment of the recording. The "consequences" flowing from an intentional tort continues.

*McNairy v. C.K. Realty*, 150 Cal. App. 4th 1500 (Cal. App. 2d Dist. 2007) found:

> "Even where the Legislature did not specify 'actual damages' included damages for mental distress, courts have reached the same conclusion. For example, 'actual damages' as used in Penal Code section 637.2, which concerns recording a confidential communication, include damages for emotional distress. (*Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 167 [1 Cal. Rptr. 3d 536].) The victim of a surreptitious recording may suffer emotional distress upon the discovery of the recording. (*Ibid*.)" *McNairy* at 1507.

"With section 637.2 the Legislature provided two measures of monetary recovery for persons whose privacy has been invaded. If the plaintiff has suffered injuries akin to those for emotional distress, 'i.e., anxiety, embarrassment, humiliation, shame, depression, feelings of powerlessness, anguish, etc.,' these are 'actual' damages which shall be trebled. But it is only the alternative, the specified recovery of $ 3,000, which defendants claim. Section 637.2 is fairly read as establishing that no violation of the privacy act is to go unpunished. Any invasion of privacy involves an affront to human dignity which the Legislature could conclude is worth at least $ 3,000." *Friddle v. Epstein* (1993) 16 Cal.App.4th 1649, 1660-1661. In *Friddle*, there was no

15

dissemination of the recording and aggrieved party was entitled to the alternative minimum amount. In the present case, Mr. Vera suffered anxiety, embarrassment, humiliation, shame, depression, feelings of powerlessness, and anguish as a result of the actions of the Defendants. He suffered from loss of reputation and loss of employment, both of which were clearly forseeable results of Defendants' illegal taping. Under standard principles of tort law, Defendants are liable for all these clearly forseeable damages caused by their tortious and criminal conduct.

## IV.
## CONCLUSION

Summary judgment is a drastic remedy and is therefore to be granted cautiously: "Neither do we suggest that the trial courts should act other than with caution in granting summary judgment ... " *Anderson v. Liberty Lobby, Inc.* (1986) 477 US 242, 255. Summary judgment is proper where the dispute is of a type *normally decided by the court* and not a jury. Where, for policy reasons, courts normally draw the ultimate conclusion, the matter is more akin to a "pure" issue of law which may be resolved on summary judgment. *Prinzi v. Keydril Co.* (5th Cir. 1984) 738 F2d 707.

Moreover, it should also be emphasized that in the context of a summary judgment motion, the Ninth Circuit has considered the factual determinations in an excessive force claim to be considerations for a jury to make. "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir.2002); *see also Liston v. County of Riverside,* 120 F.3d 965, 976 n. 10 (9th Cir.1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury."). For the foregoing reasons, Plaintiff Juan Carlos respectfully requests that the Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

Dated: May 29, 2012          /s/   *Eugene G. Iredale*
                             EUGENE G. IREDALE
                             JULIA YOO
                             Attorneys for Plaintiff JUAN CARLOS VERA