# Exhibit 2

James O'Keefe                                          Vera v. O'Keefe

UNITED STATES DISTRICT COURT

IN AND FOR THE SOUTHERN DISTRICT OF CALIFORNIA

```
------------------------------------x
JUAN CARLOS VERA, an individual,     :

               Plaintiff,            :   Case No.

         v.                          :   10-cv-01422-L-JMA

JAMES O'KEEFE, III, an individual,   :

HANNA GILES, an individual, and      :

DOES 1-20 inclusive,                 :

               Defendants.           :
------------------------------------x
```

Videotaped Deposition of JAMES O'KEEFE,III

Washington, DC

Thursday, March 15, 2012

9:43 a.m.

Pages: 1 - 267

Reported by: Alda Mandell, RPR, CRR

Exhibit 2 Page 1

James O'Keefe                                                    Vera v. O'Keefe

```
 1   BY MR. IREDALE:
 2        Q    And in Maryland.  Is that true?
 3             MR. MADIGAN:  Same objection.  Same
 4   instruction.
 5   BY MR. IREDALE:
 6        Q    And in California, right?
 7        A    Yes.  We made investigative videos in
 8   California.
 9        Q    Well, the investigative videos involved your
10   tape recording people, right?
11        A    Yes.
12        Q    And videotaping people, right?
13        A    Yes.
14        Q    Without telling them you were tape recording
15   them, right?
16        A    Yes.
17        Q    Without telling them you were videotaping
18   them, right?
19        A    Yes.
20        Q    Without obtaining their permission, right?
21        A    Yes.
22        Q    Right?  And you knew all the time in
23   California at least that that was against the law of
24   the State of California, correct?
25        A    I don't believe I violated any laws at the
```

Exhibit 2 Page 2

James O'Keefe                                                    Vera v. O'Keefe

```
 1        A    I defer to my attorney on that.
 2             MR. IREDALE:  But this is under 404(b), for
 3   the purpose of showing motive, intent and knowledge.
 4             MR. MADIGAN:  Same instruction.
 5        A    I defer to my counsel.
 6   BY MR. IREDALE:
 7        Q    All right.  You came to learn that
 8   California had a law that made it illegal to tape
 9   record people in certain circumstances, correct?
10        A    I became familiar with that, yes, but I
11   didn't believe I broke any laws.
12        Q    Well, with all due respect, I'm not asking
13   you now what you believe.  I'm asking whether you
14   became aware of the law.  You knew that there was a
15   law in California from your experience with Lila Rose
16   that dealt with tape recording people secretly without
17   their consent, right?  Right?
18        A    That's correct.
19        Q    And you understood that Lila Rose at least
20   was accused of violating that law, correct?
21        A    That's correct.
22        Q    And that law that she was accused of
23   violating says, to your understanding, that it
24   violates the law in the State of California for one
25   person to tape record another person without their
```

Exhibit 2 Page 3

1   BY MR. IREDALE:

2       Q    So without looking up the law and without

3   seeking an attorney's counsel, you just decided that

4   you hadn't violated the law.  Is that right?

5       A    That's correct.

6            MR. IREDALE:  All right.  Well, we've been

7   at it for a while.  Do you mind if we take a five

8   minute break?

9            MR. MADIGAN:  That's up to you.

10           THE VIDEO OPERATOR:  We are off the record

11  at 10:26.

12           (A recess was taken.)

13           THE VIDEO OPERATOR:  We are back on the

14  record at 10:39.

15  BY MR. IREDALE:

16      Q    Mr. O'Keefe, what if any research did you do

17  to determine whether or not it was legal for you to

18  tape record people without their knowledge in private

19  offices in the State of California?

20      A    I don't remember if I had done any research

21  at all.

22      Q    Now, you felt that you were entitled to do

23  whatever you needed to do to destroy ACORN, correct?

24      A    That's -- that's incorrect.  I mean I

25  consider myself a journalist who exposes things and

Exhibit 2 Page 4

James O'Keefe                                              Vera v. O'Keefe

```
 1        A     No, I did not.

 2        Q     And you asked him if he would keep

 3   confidential what you said, didn't you?

 4        A     Yes.

 5        Q     You brought up confidentiality.  You said

 6   this conversation's confidential, or words to that

 7   effect, didn't you?

 8        A     Yes.  I asked him if he would keep it

 9   confidential.

10        Q     And he said yes?

11        A     Yes.

12        Q     And you asked him again at the end of the

13   conversation if he would not repeat the conversation,

14   keep it confidential, right?

15        A     I don't remember what I said in the tape.

16   I'd have to look at the transcript to see exactly

17   verbatim what was said.  It's on tape.

18        Q     But you tape recorded him secretly anyway,

19   correct?

20        A     I tape recorded him and --

21        Q     Secretly.

22        A     I don't believe there was an expectation of

23   privacy in what I did.

24        Q     You don't think that he expected that you

25   were not tape recording him?  You think he believed
```

Aptus Court Reporting-www.aptusCR.com

Exhibit 2 Page 5

James O'Keefe                                                    Vera v. O'Keefe

```
 1    of the filming.
 2        Q    How about in terms of the distribution of
 3    the films, including the film of Mr. Vera?  Who was
 4    participating in those discussions?
 5        A    The distribution of the videos on the
 6    internet?
 7        Q    On the internet and on TV.
 8            MR. MADIGAN:  I'm going to object and
 9    instruct him not to answer the question with respect
10    to any videos except for San Diego.  You are
11    skillfully combining all of the -- many others in your
12    question.
13    BY MR. IREDALE:
14        Q    I'm just trying to get at, sir, at the time
15    you had these discussions, you had anticipations of
16    making videos and distributing them, right?
17        A    That's correct.
18        Q    And one of those videos that was ultimately
19    distributed was that from San Diego, correct?
20        A    Yes.
21        Q    All right.  Now I'm asking you who discussed
22    distribution of these videos.
23            MR. MADIGAN:  I'm going to object to -- and
24    instruct you not to answer the question as to anything
25    other than the San Diego video.
```

Aptus Court Reporting-www.aptusCR.com

Exhibit 2 Page 6

1    happening.

2         Q    But the first one he suggested to you -- you

3    say the first one you believe concerning marketing the

4    videos occurred in --

5         A    The first discussion we had was on that

6    July 31st or around that date, that very very initial

7    phone call.

8         Q    Concerning marketing?

9         A    Concerning working with him on publishing

10   the videos.

11        Q    Tell me about that.

12        A    That first phone call concerning all the

13   videos, I defer to my attorney and not talking about.

14             MR. MADIGAN:   This is one we've already

15   covered.  We have July and we have August.  I have

16   instructed him not to answer about July, which I think

17   is what you're back to asking him about.

18   BY MR. IREDALE:

19        Q    Well, I'm asking about whether Breitbart

20   knew in July that you intended not only to continue to

21   do this in California, but whether he also mentioned

22   marketing what was going to be done.

23        A    I don't remember having a conversation with

24   him in July about anything regarding California,

25   except that I was going to visit him in California to

Exhibit 2 Page 7

1    can't tell me what's in his heart?  What did he say?

2         A    He said that the media would call the

3    actions of the first employees isolated incidents and

4    the media was going to try to cover up for what we've

5    exposed.  That's what he said.

6         Q    And then he said we're going to have to do

7    some more here in California, or words to that effect.

8         A    He did not say that.

9         Q    What did he say?

10        A    I don't believe we really discussed the next

11   things that I was going to do.  Like I said before, I

12   said I was going to do more investigative videos, but

13   I don't think there was a specific discussion about

14   that nature of that.

15        Q    Well, he gave you to understand that he

16   wanted to market these videos to various media

17   outputs, right?

18        A    Yes.

19        Q    And that -- he gave you an understanding on

20   the 5th of August.

21        A    Well, I met him on the 6th of August.  He

22   gave me that understanding when I first spoke with him

23   in July, that he was interested in helping me market

24   my videos.

25        Q    Was money discussed in the first of July?

Exhibit 2 Page 8

James O'Keefe                                          Vera v. O'Keefe

```
 1        A    No.

 2        Q    Was money discussed on the 6th of August?

 3        A    I don't believe so.

 4        Q    Not specific amounts, but the idea that you

 5   would be paid some money, right?

 6        A    I don't remember if it was discussed.  If it

 7   was discussed, it was very brief.  But that -- those

 8   discussions really didn't happen until a number of

 9   days later.

10        Q    Until the mid August conversations?

11        A    I would say so.

12        Q    And the mid August conversations, what was

13   discussed concerning the money?

14        A    How he can compensate me for publishing

15   those videos.

16        Q    And was a number expressed at that time?

17        A    No.  Not yet.

18        Q    Just the idea that you would be compensated

19   if you could work it out.

20        A    If he could obtain the funding.  Correct.

21        Q    And he encouraged you to do your work in

22   California.

23        A    I don't remember what his comments were on

24   that, but they weren't -- there weren't very many.

25        Q    You gave him to understand that you had the
```

Aptus Court Reporting-www.aptusCR.com

Exhibit 2 Page 9

1    was another video of ACORN employees counseling pimps

2    and prostitutes how to evade the law.  And that it was

3    outrageous and it was -- and I couldn't believe that

4    this employee had said these things to me.

5         Q    Now, let me talk to you about when you were

6    actually given the money for your life rights.  When

7    was the time you received the first check?

8              MR. MADIGAN:  Objection.  Instruct you not

9    to answer.

10   BY MR. IREDALE:

11        Q    Was it before or after you sent in your

12   tape?

13        A    After.

14        Q    When was it?

15             MR. MADIGAN:  Same instruction.

16   BY MR. IREDALE:

17        Q    What was the amount of the first check?

18             MR. MADIGAN:  Objection.  Asked and

19   answered.

20        A    I will heed his advice here.

21   BY MR. IREDALE:

22        Q    Have you been paid the total $60,000?

23             MR. MADIGAN:  Same objection.

24             MR. IREDALE:  You don't want to tell me how

25   much money you were paid --

Exhibit 2 Page 10

James O'Keefe                                           Vera v. O'Keefe

```
 1              MR. MADIGAN:  No.  It's asked and answered.
 2     He's already said that.  Go ahead and answer again.
 3          A    Okay.  I was paid around a total of $65,000.
 4     I have been paid in total.
 5
 6     BY MR. IREDALE:
 7          Q    65,000.  What was the extra $5,000?
 8          A    It was an extra 5,000 paid on December 1st.
 9          Q    Has Breitbart paid you any other money other
10     than the 65,000 you've mentioned here?
11          A    He reimbursed me for a trip to see him in
12     late September 2009.
13          Q    And that trip was in connection with what?
14          A    Just to come visit with him.  Just to visit
15     and talk about journalism.
16          Q    And was it including discussions concerning
17     the release of the videos that you had made?
18          A    Yeah.
19          Q    Now, you edited those videos I understand.
20          A    I produce -- all journalists edit their
21     material.  I produce videos.  Correct.
22          Q    I didn't mean to in any way make you testy
23     by improper suggestion.
24               You took a long video --
25          A    Uh-huh.
```

Exhibit 2 Page 11

James O'Keefe                                    Vera v. O'Keefe

```
 1        Q    Did you use the same equipment in San Diego
 2    that you used in the other places?
 3        A    Yes.
 4        Q    No change at all.  Same thing?
 5        A    I believe it was the same.
 6        Q    All right.  What equipment did you use?
 7        A    In San Diego?
 8        Q    And everywhere else.
 9             MR. MADIGAN:  I'll instruct him not to
10    answer it as framed.
11        A    And I will...
12    BY MR. IREDALE:
13        Q    You refuse to answer as your attorney has
14    told you to?
15        A    About the other locations, yes.
16        Q    But you just told me the equipment was the
17    very same in all the locations.  Is there some secret
18    that we're trying to conceal?
19        A    No.
20        Q    Okay.  What equipment did you use?
21        A    In San Diego I used a hidden camera and a
22    recording -- an audio recording device.
23        Q    Describe the hidden camera.
24        A    It is a little camera embedded in a tie.
25        Q    And could you describe the dimensions of the
```

James O'Keefe                                              Vera v. O'Keefe

1    camera?

2        A     It's the size of a pin head, and it's

3    located -- imbedded in many different things.  It

4    happened to be imbedded in a tie.

5        Q     And is there a wire coming off of it if you

6    know?

7        A     Yes.

8        Q     And where does the wire go to?

9        A     It goes into a recording box that records

10   the video onto an SD chip card.

11       Q     What is the size of the recording box?

12       A     It's probably 3-inches by 2-inches or so.

13       Q     And can you give me the manufacturer of the

14   tie camera?

15       A     The manufacturer?

16       Q     Yes.

17       A     I don't know what company manufactures them.

18   They're distributed through a variety of websites.

19   You can purchase these cameras.  It doesn't have a

20   name to it.

21       Q     How about the recording device?  Did it have

22   a name to it?

23       A     Not on the box.  I believe -- I believe

24   these cameras were manufactured overseas, but I'm not

25   sure the company that makes them.

**Aptus Court Reporting-www.aptusCR.com**

Exhibit 2 Page 13

1      Q    And then so you take the SD chip and insert

2    it in a computer and you have the data that you

3    recorded.

4      A    That's correct.

5      Q    Now, the tie, which is where the video

6    records not only image but also audio?

7      A    Correct.

8      Q    It records the words of the people as well

9    as the images of the people whom you are secretly

10   recording.

11     A    Yes.

12     Q    Now, in addition to that, you said you had a

13   separate audio recorder.

14     A    Yes.

15     Q    And would you describe to me what that was?

16     A    It was very similar to the recorder that's

17   sitting on the table right there.

18     Q    Dimensions, an inch by 3-1/2 inches?

19     A    Yeah.

20     Q    Commercially available?

21     A    Yes.

22     Q    Do you remember what brand you used?

23     A    I don't.

24     Q    And you kept that where?

25     A    In -- in the pocket.  In my pocket.

Exhibit 2 Page 14

James O'Keefe                                          Vera v. O'Keefe

1    material on the coat that my grandmother had and
2    decided to give to me.
3        Q    **Your grandmother gave you the chinchilla**
4    **coat?**
5        A    Yes.
6        Q    **Did you tell your grandmother you needed it**
7    **so you could look like a pimp?**
8        A    I did not.
9        Q    **What was the reason that you told your**
10   **grandmother you needed the chinchilla coat?**
11           MR. MADIGAN:  Objection.  Relevance of that.
12   I'll let him answer anyway.
13       A    The reason -- I didn't give her a reason.  I
14   said do you have a fur coat that I could utilize.  And
15   then she -- she just decided to give me one.
16   BY MR. IREDALE:
17       Q    **And could you tell me the size of the**
18   **chinchilla fur coat?**
19       A    I don't remember.  It was a little small.
20       Q    **It did appear to be a little small on you?**
21       A    It was more of an over -- an -- it wasn't
22   really a full fur coat.  It was more of just something
23   you put on maybe to keep warm or something, a shawl or
24   something of that nature.
25       Q    **It was like a chinchilla jacket?**

Aptus Court Reporting-www.aptusCR.com

Exhibit 2 Page 15

James O'Keefe                                                          Vera v. O'Keefe

1       Q      Let me go now to the hat.

2       A      Uh-huh.

3       Q      Where did you get the hat?

4       A      My grandfather.

5       Q      Your grandmother gave you a chinchilla coat

6    that you wore in your role as a pimp and you got the

7    hat from your own grandfather?

8       A      Yes.

9       Q      And what kind of hat was it?

10      A      It's a derby hat I think.  He had purchased

11   it I believe at a secondhand store 10 years earlier in

12   Las Vegas, and he had given it to me.  It sat in my

13   closet for a number of years.  And I retrieved it.

14      Q      Now, having accoutered yourself with a hat

15   from your grandfather and the chinchilla coat from

16   your grandmother, did you get any other accessories so

17   that you could portray yourself in the role of a

18   panderer?

19      A      Hannah Giles had purchased sunglasses with

20   large -- almost looked like ski goggles, sunglasses.

21   Fake designer glasses.  And a cane I had previously

22   purchased from a Dollar Store.  Utilized the cane for

23   the trailer.  I believe that was it.

24      Q      And the cane you paid a dollar for?

25      A      Yes.

Aptus Court Reporting-www.aptusCR.com

Exhibit 2 Page 16

1    the plane was about to take off.

2         Q    Let me ask you this.  Did you think at some

3    point of setting up a sting operation so that he could

4    be for instance directed to go down to the border with

5    a truck, and that way you could prove that he really

6    intended to do something illegally?  Did you ever

7    conceive of that in your plan?

8         A    It's possible, but I would never break any

9    laws if I were to do that.

10        Q    I would never want you to break any laws.

11             By the way, you are on probation now for

12   breaking the law, are you not?

13        A    A Class B misdemeanor.

14        Q    Oh.  A misdemeanor?  And therefore, not a

15   serious crime.

16        A    Just answering your question.

17        Q    Yes.  I appreciate your answering my

18   question.  You just told me I would never break any

19   laws, but you pled guilty to the commission of a crime

20   in a court in Louisiana.  District Court I believe.

21   Is that true?  Is that true?

22        A    I pled guilty to a misdemeanor.  Yes.

23        Q    Yes.  And one of your co-defendants I

24   believe was the son of the acting U.S. Attorney in

25   that district in Louisiana, wasn't he?

Exhibit 2 Page 17

James O'Keefe                                                    Vera v. O'Keefe

1   office.

2        Q    Oh, I'm sorry.  I misunderstood, because on

3   the tapes that were broadcast on TV, they were always

4   introduced by that raggedy coat and the cane.  But

5   when if fact you actually saw Mr. Juan Carlos Vera,

6   you weren't wearing your pimp outfit?

7        A    I was wearing a -- I was not wearing the

8   pimp outfit.  No.

9        Q    Were you wearing a coat and tie?

10       A    I was wearing a shirt and pants.

11       Q    A shirt and pants?  And what kind of shirt?

12       A    Collared shirt.

13       Q    Pressed?

14       A    Probably not pressed.

15       Q    Neat?

16       A    Maybe a little wrinkled.

17       Q    Clean?

18       A    Sure.

19       Q    Color?

20       A    I believe it was a blue shirt.

21       Q    And pants.  How about pants?  What kind of

22   pants were you wearing?

23       A    They were either khakis or some type of

24   khaki pants.

25       Q    Shoes?

Aptus Court Reporting-www.aptusCR.com

Exhibit 2 Page 18

```
 1        A    Yes.

 2        Q    What kind?

 3        A    Brown shoes I think.

 4        Q    Leather?

 5        A    Yeah.

 6        Q    Scuffed or shined?

 7        A    Maybe a suede material.

 8        Q    Suede?

 9        A    Something like that.  Like Docksiders or

10   some material.

11        Q    So the actual appearance that you gave to

12   the people when you talked to them in these videos was

13   different from the appearance that you put in the

14   lead-in to the broadcast.

15        A    That's incorrect.  That's incorrect.

16             MR. MADIGAN:  I'm going to object to the

17   question unless it is about the San Diego video.

18             MR. IREDALE:  All right.  That's fair.

19   BY MR. IREDALE:

20        Q    You -- in the San Diego video when you

21   actually talked to Mr. Vera --

22        A    Uh-huh.

23        Q    -- you didn't wear the grandad's hat.

24        A    No.

25        Q    You didn't wear grandma's fur coat.
```

Exhibit 2 Page 19

James O'Keefe                                              Vera v. O'Keefe

1        Q      Show both sides.

2        A      I show the full tape, which is more than any

3    journalist in America shows.

4        Q      Well, what gets to the public is the edited

5    tape, but you make available the audio transcript.

6        A      That's correct.

7        Q      On Breitbart's website there are no full

8    videos.   There are only audio transcripts, correct?

9        A      That's correct.

10       Q      The full videos were never shown, correct?

11       A      That's correct.

12       Q      Only the audio, right?

13       A      That's correct.

14       Q      Now, did you ever go back to any of these

15   persons that you tape recorded in secret with this

16   false identity and ask them what they were thinking?

17              MR. MADIGAN:   I'm sorry.  Are you asking

18   about beyond San Diego?

19              MR. IREDALE:   Yeah.

20              MR. MADIGAN:   Okay.  I instruct you not to

21   answer the question.

22       A      I'll take my attorney's counsel and not

23   answer that question.

24              MR. IREDALE:   And you know you're not

25   seeking a protective order for any of these things.

Exhibit 2 Page 20